**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| The Baptist Home of Philadelphia d/b/a | ) | |
| Deer Meadows Retirement Community, | ) | Case No. 14-13305 (ELF) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| The Baptist Home Foundation, | ) | Case No. 14-13306 (MDC) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |

**DECLARATION OF LISA SOFIA IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Lisa Sofia, hereby declare under penalty of perjury:

1.      I am the President of BHP Services, Inc., a Pennsylvania nonprofit corporation ("BHP").   Pursuant to a Management Agreement between BHP and The Baptist Home of Philadelphia d/b/a Deer Meadows Retirement Community (the "Home"), I am the President and Chief Executive Officer of the Home.    I am also the President and Chief Executive Officer of The Baptist Home Foundation (the "Foundation" and together with the Home, the "Debtors").   I have been employed since January of 2012 in these positions.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      The Home's Board of Trustees (the "Board") oversees the organization's management, and the Chief Financial Officer, Ronald Singer, and I report directly to the Board.

3.      I have 34 years of experience in the field of senior living, most of which have been spent with the Home in various capacities.  I hold a Bachelor of Science Degree in Nursing with a Pennsylvania Registered Nurse License, a Master's Degree in Health Administration and a Master's Degree in Public Health Education.  I am a Licensed Nursing Home Administrator for

the Commonwealth of Pennsylvania, a Certified Aging Professional and Assisted Housing Manager. Additionally, I serve on the Policy Congress for the LeadingAge national association and as a Board member for the Southeastern Chapter of the state association, LeadingAge PA. Additionally, I have served as a Board member and on various committees for LeadingAge PA. Currently, I am serving as the Chair of the Annual Conference for the LeadingAge PA association and as a coach for Pennsylvania's Fellows in Leadership Program.

4.    Ronald Singer is the Chief Financial Officer for the Home. Mr. Singer has over 25 years of healthcare experience. His core experience is successfully turning around troubled facilities as a consultant, receiver and as chief financial officer. He was specifically hired because of this experience. Mr. Singer holds advanced degrees in Accounting, Healthcare Administration, and Healthcare Financial Management. He has also practiced as a Licensed Nursing Home Administrator.

5.    I submit this declaration (i) in support of the petitions of the Debtors for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) in support of the following applications and motions filed contemporaneously herewith by the Debtors (the "First Day Motions"):

- *Debtors' Motion for Order Authorizing Use of Pre-Petition Bank Accounts and Business Forms and Waiving the Requirements of 11 U.S.C. § 345* (the "Cash Management Motion");

- *Debtors' Motion for Order Authorizing Payment of Certain Prepetition (1) Wages, Salaries and other Compensation, (2) Employee Medical, Dental and Similar Benefits, (3) Withholdings from Employee Paychecks and Related Deductions and Payments, and (4) Reimbursable Employee Expenses* (the "Employee Wages Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. § 361, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Cash Collateral Motion");

- *Debtors' Motion Pursuant to 11 U.S.C. § 333 for Determination that Appointment of Patient Care Ombudsman is Unnecessary* (the "Ombudsman Motion"); and

LEGAL\18714727\6

- *Debtors' Motion for Entry of Interim and Final Orders Providing for Adequate Assurance of Payment for Future Utility Services and Restraining Utilities from Discontinuing, Altering or Refusing Service Pursuant to 11 U.S.C. §§ 105 and 366* (the "Utilities Motion").

6.     I also submit this declaration to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

7.     Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the operations of the Debtors and the continuing care retirement community industry as a whole.  If called upon to testify, I would testify completely to the facts set forth in this declaration.

## BACKGROUND

### A.     The Debtors' Business

8.     The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on April 25, 2014 (the "Petition Date").

9.     The Home is a 501(c)(3) tax-exempt, charitable Pennsylvania nonprofit corporation formed in 1869.   It owns and operates a continuing care retirement community known as "Deer Meadows Retirement Community", which is located at 8301 Roosevelt Boulevard, Philadelphia, Pennsylvania.

10.     The Home offers 126 living accommodations, which vary in size, for independent living and personal care. The Home presently also has 206 skilled nursing beds in the nursing and rehabilitation center that offers short and long term care. In 2008, the skilled nursing center opened an Airway Unit that offers short and long term care for ventilator-dependent individuals.

Personal care is licensed by the Pennsylvania Department of Welfare. The Skilled Nursing and Rehabilitation Center is certified by Medicare and Medicaid and is licensed by the Pennsylvania Department of Health. In total, 491 residents can make the Deer Meadows Retirement Community their home.

11.     For 145 years, the mission of the Home has been to provide quality continuing care living facilities and support services for its adult population regardless of race, ethnicity, national origin, gender or creed. The Home is a thoughtful, forward-looking and active leader in the aging services network. The Home strives to excel in the care and services it provides, which include short-term and long-term skilled rehabilitation and nursing care, personal care and independent living for the older adult population. The Home and its leadership continuously attempt to anticipate and meet the expectations of all of its stakeholders, especially the residents and patients it serves. Its stated core values are: "compassion (caring for those it serves with kind, heartfelt, and genuine concern); creativity (continuous improvement through innovation and teamwork); integrity (dedication to doing what is right); quality (excellence in service to others); and respect (highest regard for the worth and right of others)."

12.     The Foundation is a 501(c)(3) tax-exempt charitable Pennsylvania nonprofit corporation formed in 1997 to conduct, develop and expand fundraising, endowment, asset management and related activities on behalf of the Home and affiliated entities.

**B.      Capital Structure**

**(i)      Bond Debt**

13.     U.S. Bank National Association (the "Trustee") is successor indenture trustee under the Trust Indenture, dated as of April 15, 1998, between the Philadelphia Authority for Industrial Development (the "Authority") and First Union National Bank ("First Union"), as bond trustee, pursuant to which the Authority issued (i) its Health Care Facilities Revenue Bonds Series 1998A (The Baptist Home of Philadelphia) in the aggregate principal amount of $25,825,000.00, and (ii) its Health Care Facilities Revenue Bonds Series 1998B (The Baptist

Home of Philadelphia) Extendable Rate Adjustable Securities in the aggregate principal amount of $2,550,000.00 (together, the "Bonds").

14.    Pursuant to the Loan Agreement, dated as of April 15, 1998, the Authority loaned the proceeds of the Bonds to the Home for the purpose of, among other things, financing alterations, additions, and improvements to the Home's health care facilities.

15.    Contemporaneously with the execution and delivery of the Trust Indenture and the Loan Agreement, the Authority assigned and transferred to First Union, as trustee, all of the Authority's right, title, and interest in and to the Loan Agreement as well as all payments thereunder, to be held in trust, as part of the security for payment of the Bonds.

16.    To evidence the Home's obligations under the Loan Agreement, the Debtors executed and delivered two master promissory notes to First Union, as master trustee, in the respective principal amounts of $25,825,000.00 and $2,550,000.00, pursuant to the Master Trust Indenture (as supplemented, the "Master Indenture"), dated as of April 15, 1998, between the Debtors and First Union.  The Trustee succeeded First Union as master trustee under the Master Indenture.

17.    Pursuant to the Master Indenture, the Debtors granted the master trustee a security interest in, among other things, all of the rights, titles, and interests of the Debtors in and to the Pledged Revenues (as defined in the Master Indenture), including but not limited to all revenues of the Debtors from whatever source derived, accounts, general intangibles, documents, instruments, chattel paper, and all proceeds of the foregoing.

18.    Pursuant to the Mortgage and Security Agreement (the "Mortgage"), dated as of April 15, 1998, between the Home and First Union, as master trustee, the Home granted the master trustee a mortgage lien upon certain real property and a security interest in certain personal property, all as more specifically described in the Mortgage.  The Mortgage was recorded on April 21, 1998, in the Office of the Commissioner of Records for Philadelphia County.

5

19.    Pursuant to the Loan Agreement, the Debtors are required to make monthly loan payments to the Trustee to cover scheduled payments of principal of and interest on the Bonds. The Debtors have not made monthly loan payments to the Trustee since November 2011. Failure to make payment constitutes an event of default under the Loan Agreement. The occurrence of an event of default under the Loan Agreement constitutes an event of default under the Trust Indenture, Master Indenture and the Mortgage. As of March 31, 2014, the outstanding principal and accrued interest under the Bond Documents was $23,867,289.45, comprising principal in the amount of $22,735,000 and accrued interest in the amount of $1,132,289.45. In addition, the Debtors are obligated to pay additional interest, fees, and expenses, including but not limited to attorneys' fees and expenses, incurred in connection with the enforcement and collection of the Bonds, which accrue pre-petition and post-petition.

20.    During the time when no loan payments were being made to the Trustee, the Debtors continued making payments to other creditors. Notwithstanding the existence of events of default under the governing documents, the Trustee has communicated regularly during this two year period with the Debtors and their management and professionals, encouraged the Debtors to explore alternatives for improving operations and for restructuring the Debtors' debt, and deferred exercising any of its remedies.

(ii)    **Bank Debt**

21.    Pursuant to a Line of Credit Note (the "First Bank Note"), dated January 22, 2008, Beneficial Mutual Savings Bank ("Beneficial") extended an unsecured line of credit loan to the Home in an amount not to exceed the principal sum of $1,375,000.00.

22.    Pursuant to a Line of Credit Note (the "Second Bank Note"), dated May 9, 2008, Beneficial extended a second line of credit loan to the Home in an amount not to exceed the principal sum of $6,750,000.00.

23.    The Home purportedly secured the Second Bank Note by: (i) the Pledge and Security Agreement (Cash Accounts) (the "Cash Pledge Agreement"), dated as of May 9, 2008, between the Home and Beneficial, pursuant to which the Home assigned certain deposit accounts

6

of the Home to Beneficial as collateral for the Second Bank Note; and (ii) the Pledge and Security Agreement (Marketable Securities) (the "<u>Securities Pledge Agreement</u>" and together with the Cash Pledge Agreement, the "<u>Pledge Agreements</u>"), dated as of May 9, 2008, between the Home and Beneficial, pursuant to which the Home purportedly granted to Beneficial a security interest in a brokerage account (the account number is not identified) with Pershing Advisor Solutions LLC and certain securities held therein as collateral for the Second Bank Note.

24.      In July 2009, the Home and Beneficial entered into the Note and Loan Document Modification Agreement, pursuant to which the First Bank Note was modified to provide, among other things, that the security interests, liens, and other rights in or relative to any collateral granted to Beneficial by the Home by or in any instrument or agreement also will secure all other liabilities of the Home to Beneficial.  As a result, the Pledge Agreements also purport to secure the Home's pre-existing unsecured obligations under the First Bank Note.

25.      On or about August 15, 2011, the Home, Legacy at Bristol, Inc. (a non-debtor affiliate of the Debtors), and Beneficial entered into an agreement extending the maturity of the Second Bank Note to August 1, 2014, and requiring monthly payments of principal and interest on the Second Bank Note with a balloon payment of $5,515,000.00 at maturity.

26.      Despite the Home remaining current on its obligations to Beneficial, Beneficial has threatened to liquidate its collateral under the Pledge Agreements.  Beneficial also has advised the Debtors that the loans will not be extended or renewed upon expiration on July 31, 2014.

**(iii)    <u>Trade Debt</u>**

27.      In addition to the bond debt (the "<u>Bond Debt</u>") and the Beneficial debt, the other primary creditor constituency in this case consists of general unsecured creditors (*i.e.,* trade debt) who are owed approximately $3,240,250 as of the Petition Date.

C.    **Events Leading to Bankruptcy**

28.    The primary cause of the bankruptcy is Debtors' inability to service its debt as described above.   While the Trustee and certain of the holders of the Bonds (the "Bondholders") have worked with the Debtors to address various restructuring alternatives outside of bankruptcy, it has become clear to both the Bondholders and the Debtors that Chapter 11 relief is necessary.

29.    The Debtors have made a number of very successful operational improvements over the course of the last few years, and these efforts continue.  In October 2011, the then-President and Chief Executive Officer of the Debtors resigned.  In November 2011, the Board of Trustees of the Debtors appointed me, the former Chief Operating Officer, as the Interim President and Chief Executive Officer until January 2012, when they appointed me President and Chief Executive Officer.

30.    The Home began a financial turnaround plan in November 2011 and hired financial and legal advisors to assist the Home in seeking forbearance from the Bondholders and Beneficial, the Home's secured creditors.  The Home's management addressed the poor financial performance through aggressive measures that began in January 2012.  These measures included various revenue enhancement and cost containment strategies to improve financial performance.

31.    For example, the Home's management implemented strategies to increase occupancy through liaisons at local hospitals, as well as obtaining preferred provider status.  The Home also converted one of its nursing units to a short-term rehabilitation unit with private rooms and more attractive amenities.   In addition, the Home contracted with a marketing firm that specializes in the senior living field to assist with marketing efforts, which have increased occupancy.

32.    A favorable payer mix is critical to the Home's success, and the Home's management has managed payer mix to achieve a lower Medicaid population, which has the lowest third-party reimbursement rate.

33.    The Home monitors its pricing relative to competitors in the market area. Currently, the Home has limited opportunity to dramatically increase pricing due to prior pricing

increases.  However, the Home charges for virtually all ancillary products and services in the skilled nursing facility and utilizes a tiered pricing structure for personal care.

34.     More recently, the Home has obtained concessions from its labor union that will significantly reduce costs.

35.     The Debtors have increased revenues and lowered costs and continue to work hard to do so, while remaining faithful to their mission of providing the highest quality residential services and care to seniors.  These measures, while enhancing the value of the Debtors, will not alone permit resolution of debt outside of a Chapter 11 bankruptcy proceeding.

## SUMMARY OF FIRST DAY MOTIONS

36.     The Debtors filed the First Day Motions concurrently with the filing of their Chapter 11 petitions.  The Debtors request that each of the First Day Motions be granted, as each will be critical in achieving a successful and smooth transition in and through Chapter 11.

37.     For a more detailed description of the First Day Motions than is set forth below, the Debtors respectfully refer to the Court to the respective First Day Motions.  To the extent that this declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this section but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

**A.     Cash Management Motion**

38.     The Debtors seek entry of an order authorizing the Debtors to (a) continue use of their existing bank accounts, (b) continue use of their business forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors-in-possession, and (c) continue their existing investment practices.

**(i)     Description of the Debtors' Cash Management System**

39.     In the ordinary course of business, the Debtors utilize a cash management system that provides established processes for the collection, management, transferring, and

9

disbursement of funds generated and used in their operations (the "Cash Management System").
The bank accounts which the Debtors use in connection with the Cash Management System (the
"Bank Accounts") include the following:

Home

| Type of Account | Bank | Account Number |
| --- | --- | --- |
| Deposit Account | Beneficial | ****-0015 |
| Deposit Account | Beneficial | ****-8006 |
| Accounts Payable | Beneficial | ****-0014 |
| Payroll Account | Beneficial | ****-0013 |
| Deposit Account | Citizens | ****-2834 |
| Personal Needs | Wells Fargo | ****-3706, 3696, and 3683 |

Foundation

| Type of Account | Bank | Account Number |
| --- | --- | --- |
| Operating | Beneficial | ****-0001 |

40.    In the ordinary course of business, the Debtors receive, deposit and issue checks
and wire transfers into and out of their respective Bank Accounts.  Funds are routinely received
from residents and third party payers, including government agencies, for payment of services
rendered and are disbursed for payment of employee payroll and taxes and various accounts
payable to third party vendors, suppliers, and outside contractors.

41.    I believe that Beneficial asserts a lien in the Home's Bank Accounts at Beneficial
pursuant to the Cash Pledge Agreement.  The Debtors are not presently seeking to use any "cash
collateral" of Beneficial.

42.    The Debtors intend to open new debtor in possession accounts at Citizens Bank
following the Petition Date.

43.    Medicaid and Medicare payments are currently remitted directly to the Beneficial
*0015 account and the *8006 accounts respectively.  However, both require an application to
switch from one bank account to another, and it generally takes 60 to 90 days to switch accounts.

It therefore would be especially detrimental to the Debtors were they required to change these accounts immediately upon the bankruptcy filing. The Debtors are seeking an order, however, directing Beneficial to follow the Debtors' instructions with regard to any funds, regardless of source, which are deposited for any reason into the Beneficial accounts following the Petition Date.

44.    It should be noted that the three Personal Needs Accounts at Wells Fargo referenced above are resident-owned, and are only administered by the Home. There is a Trust Account into which residents' social security, pension, and funds from other sources are deposited. There is a Care Cost Account into which funds from the Trust Account flow in order to pay for residents' stay at the Home. Finally, there is a Petty Cash Account from which residents can obtain small amounts of money they may use at their discretion. The Home is required to have a surety bond equal in value to the sum balance of these accounts, and is also required to provide a full accounting of each individual resident's banking activity and balance.

45.    The Debtors maintain detailed and accurate records of all disbursements and transfers flowing within the Cash Management System, including all checks that are written on their accounts. The Debtors' banks allow the Debtors to easily monitor the Bank Account balances and activity, generate reports, hold and release checks, stop payments, transfer funds and send wires.

46.    All prepetition intercompany balances between the Debtors will be frozen, subject to further order of the Court, and all post-petition transfers between the Debtors will be separately accounted for.

47.    In addition to the Bank Accounts identified above, the Debtors maintain the following investment accounts with Pershing Advisor Solutions LLC:

a.    Account No. 6U7-346339 (Beneficial Mutual Savings Bank as Secured Party for the Baptist Home of Philadelphia DBA Deer Meadows Retirement Community) - restricted account;

b.       Account No. 6U7-346289 (Beneficial Mutual Savings Bank as Secured Party for the Baptist Home of Philadelphia dba Deer Meadows Retirement Community);

c.       Account No. 6U7-346305 (Beneficial Mutual Savings Bank as Secured Party for the Baptist Home of Philadelphia dba Deer Meadows Retirement Community);

d.       Account No. 6U7-346313 (Beneficial Mutual Savings Bank as Secured Party for the Baptist Home of Philadelphia dba Deer Meadows Retirement Community);

e.       Account No. 6U7-346297 (Beneficial Mutual Savings Bank as Secured Party for the Baptist Home of Philadelphia dba Deer Meadows Retirement Community); and

f.       Account No. 6U7-358383 (Baptist Home Foundation Investment Fund).

I believe that Beneficial asserts a lien in accounts (a) through (e) pursuant to the Securities Pledge Agreement.

**(ii)      The Debtors' Business Forms**

48.      In the ordinary course of business, the Debtors use several varieties of business forms. To minimize the expense to the bankruptcy estates and to avoid any confusion with residents, employees, and other third parties, the Debtors respectfully request that the Court authorize the Debtors to continue to use all business forms, including without limitation, checks, letterhead, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such Business Forms were used by the Debtors immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession.

**(iii)     Benefits of Continuing the Cash Management System**

49.      During the pendency of these Chapter 11 cases, the Debtors intend to fund operations from existing cash and post-petition receipts, and the Debtors will establish new debtor in possession accounts at Citizens Bank for that purpose. However, I believe that if the Debtors are required to close all existing Bank Accounts and terminate use of the Cash

12

Management System immediately, it may cause disruption to the Debtors' ordinary financial affairs and would be prejudicial to the Debtors' bankruptcy estates.

50.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

## B.    Employee Wages Motion

51.    The Debtors seek entry of an order (i) authorizing, but not requiring, the Home to reimburse prepetition expenses and to pay prepetition claims for, among other items, ordinary and customary wages and salaries, federal and state withholding taxes, and payroll taxes, which the Home pays in the ordinary course of business (collectively, the "Wage Obligations"), (ii) authorizing, but not requiring, the Home to continue its employee benefit programs (collectively, the "Employee Benefits" and together with the Wage Obligations, the "Employee Obligations"); and (iii) to the extent that certain banks and other financial institutions are required to receive, process, honor, and pay checks presented for payment by the Home's employees, directing such banks and financial institutions to honor all funds transfer requests made by the Home relating thereto.

52.    The Home's workforce is currently 369 employees (collectively, the "Employees") performing a variety of functions ranging from full nursing care to housekeeping and maintenance to dining room staff and office administration.    The Home employs these Employees directly.    The Home's officers (the "Officers") – Ronald Singer and I - are separately employed by BHP.    The Foundation does not separately employ any people.    The Foundation is managed by BHP, under the guidance of the Foundation's Board of Trustees.

53.    The Home's workforce is critical to its business operations.    Each of the Employees is essential not only to the continued, uninterrupted operation of the Home's business, but to effectuating the orderly administration of these Chapter 11 cases.    The Employees have invaluable experience and expertise that are vital to the Home's operations.

13

Among other things, the Home requires its Employees to provide a wide variety of specialized services associated with its unique, high quality senior living services.    Failure to provide essential services, to develop relationships, and to maintain the residential campus will cause both current and prospective residents to seek out competitors.  As a result, the Home's business will not only lose its going concern value, but relations with residents and the community will also be harmed, if Employee morale is not maintained.    More importantly, the loss of Employees will at minimum diminish the amount and quality of vital services provided to current residents who rely on the Employees for their well-being and could cause harm to the health and safety of residents.    Such a scenario is not only unacceptable to the Debtors but is contrary to public policy, and demonstrates why the Home's workforce is so critical.

### (i)    Prepetition Wage Obligations
### (a)  Wages

54.    The Home pays the Employees every two weeks on a Friday.  On the non-payroll weeks, the Home makes payment to BHP under the parties' Management Agreement, which allows for timely payment of the Officers.    Each two-week payroll for the Employees, including wages, salaries, and employment-related taxes, is estimated to be approximately $390,000, inclusive of overtime hours (the "Wages").    A third party administrator, JetPay Payroll Services, generates paychecks in an electronic file that is sent to the Home's payroll coordinator, who then prints the checks at the Home's facility.    The checks are made available to Employees on a payroll Friday.  The Home does not have a direct deposit option for Employees.

55.    On April 18, 2014, the Home paid the Employees their prepetition Wages for the period March 31, 2014 to April 13, 2014.  The Employees have continued to accrue Wages since that date.  As of the Petition Date, the aggregate amount of accrued Wages through the Petition Date that remain unpaid to the Employees is approximately $340,000.

56.    The Debtors also seek express permission to make payment to BHP, pursuant to the Management Agreement, to the extent necessary to ensure that the Officers can be paid in the

14

ordinary course. As of the Petition Date, the total accrued and unpaid amounts to the Officers was $25,260.27.

57.     The Debtors will not make payments to any individual Employee or Officer pursuant to an order granting the Employee Wages Motion in excess of $12,475, which I understand is the maximum amount allowable as a priority claim pursuant to section 507(a)(4) and (a)(5) of the Bankruptcy Code.

### (b)     Reimbursement of Prepetition Employee Business Expenses

58.     Prior to the Petition Date, and in the ordinary course of business, the Home reimburses Employees for certain expenses incurred on behalf of the Home in the scope of their employment ("Reimbursable Expenses"). Most expenses incurred by Employees are paid for by a corporate credit card in the name of the Home and there is not a need to reimburse the Employees as the Home directly pays such credit card charges. However, certain expenses such as for mileage are not capable of being paid through the use of a credit card. In such cases, the Home reimburses Employees for such expenses through its accounts payable department.

59.     The Employees do not always submit claim forms for reimbursement promptly, so it is difficult for the Home to determine the exact amount of outstanding Reimbursable Expenses at any particular time or the total amount that may be owed as of the Petition Date. I believe, however, that the Reimbursable Expenses for the prepetition period will total no greater than $1,000. All post-petition employee expenses shall be reimbursed in the ordinary course of business.

### (c)     Prepetition Withholdings and Deductions

60.     The Home withholds from each Employee wage amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities. The Home then matches from its own funds social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment

insurance (the "Employer Payroll Taxes"), and together with the Withheld Amounts, the "Payroll Taxes").

61.     The Payroll Taxes are held in the Home's payroll account pending their delivery to the appropriate federal, state, or local taxing authorities. As of the Petition Date, I believe that all Payroll Taxes then due have been remitted to the appropriate taxing authorities. However, out of an abundance of caution, the Home seeks authority, but not direction, to honor and process their prepetition obligations with respect to the Payroll Taxes, including forwarding any unremitted Withheld Amounts to the appropriate taxing authorities.

62.     During each applicable pay period, the Home routinely deducts certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar legally ordered deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits, insurance premiums, flexible and/or health savings account contributions, 403(b) plan contributions, legally ordered deductions and other miscellaneous deductions) (collectively, the "Deductions") and forward those amounts to the applicable parties or sponsors of the Home's benefit plans. As of the Petition Date, I believe that only nominal Deductions have not been forwarded to the appropriate third party recipients. However, to the extent that any such amounts are outstanding, the Debtors seek authority to forward these pre-petition Deductions to the applicable third party recipients.

**(ii)     Employee Benefits**

63.     In the ordinary course of business, the Home provides its Employees with certain employee benefits, including but not limited to: (a) vacation, holiday, sick day, and personal day policies, (b) medical and health care programs, and (c) certain insurance benefits, described in greater detail below (collectively, the "Employee Benefits").

**(a)     Vacation, Holiday, Sick Days, and Personal Days**

64.     In the ordinary course of business, the Home makes certain vacation, holiday, sick days, and personal day allowances to the Employees. The Home requests that the Court

16

authorize, but not direct, the Home to honor vacation, holiday, sick days, and personal days accrued by Employees prior to the Petition Date and to allow such employees to use such time in the ordinary course of business.

### (b)    Health Benefit Plans

65.    Independence Blue Cross is the sponsor of the Home's health plan (the "Health Benefit Plan"). The Home pays a portion of the premiums for medical, dental, and vision coverage of each Employee. An optional pre-tax flexible spending account is also available to Employees, at their expense, for eligible out-of-pocket health care and dependent expenses.

66.    As of the Petition Date, I believe that there are no accrued and outstanding prepetition obligations with respect to the insurance described herein.

### (c)    Insurance

67.    The Home offers Employees term life insurance for all Employees equal to their annual salary with a maximum cap at $90,000. Employees must work a minimum of 32 hours per week to be eligible for this benefit. Employees may purchase through a payroll deduction additional life and disability insurance for themselves and dependents. Short term disability insurance is offered to non-union Employees only, and long term disability insurance is offered to union Employees only through their collective bargaining agreement. In addition, the Home maintains a workers' compensation policy, through UPMC Work Partners, to provide Employees with compensation for injuries arising from or related to their employment with the Home. As of the Petition Date, I believe that there are no accrued and outstanding prepetition obligations with respect to the insurance described herein.

### (d)    Payment to Third Parties Incident to Payment and Contributions

68.    I believe that the aggregate amount of all costs incident to, *inter alia*, the Unpaid Wages, Payroll Taxes, Deductions, and Employee Benefits, including processing costs or administrative costs ("Prepetition Processing Costs") accrued but unpaid as of the Petition Date is nominal. I believe that the payment of the Prepetition Processing Costs is necessary to ensure

that third party providers continue to provide services with respect to the Home's prepetition employee-related obligations.

### (e)    Banks to Honor and/or Reissue Checks

69.    I also believe that it is necessary for all applicable banks and other financial institutions to be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtors' payroll account or disbursement account, whether such checks were presented before or after the Petition Date.

### C.    Cash Collateral Motion

70.    The Debtors' Bond Debt is described in detail above.

71.    I believe that the Debtors' cash and cash equivalents as of the Petition Date securing the obligations under the Loan Agreement and Indenture (the "Cash Collateral") constitutes "cash collateral" within the meaning of section 363 of the Bankruptcy Code. Without access to Cash Collateral, the Debtors would not have sufficient available cash to continue operations during the Chapter 11 cases. The Cash Collateral will, subject to an approved budget, be used to fund the Debtors' various operating expenses and professional fees as well as insurance, taxes, Chapter 11 fees and other costs.

72.    The Debtors need to use the Trustee's cash collateral to continue operations during these Chapter 11 Cases. Following substantial negotiations among the parties and their professionals conducted in good faith and at arms' length, the Trustee has consented to the use of its cash collateral pursuant to the terms and conditions set forth in the proposed form of interim order (the "Proposed Interim Order") attached to the Cash Collateral Motion. Given the circumstances, I believe that the terms and conditions in the Proposed Interim Order are reasonable, warranted, and consistent with the Bankruptcy Code. Entry of the Proposed Interim Order will enable the Debtors to continue operations during these Chapter 11 Cases and provide the Debtors an opportunity to reorganize or dispose of their assets in an orderly fashion.

73.    Without the use of Cash Collateral, the Debtors would suffer immediate and irreparable harm and would likely be required to cease operations immediately. At a minimum,

inability to use Cash Collateral would eliminate or significantly decrease the likelihood of a successful orderly reorganization or disposition of the Debtors' assets in Chapter 11, and would not be in the best interest of the Debtors, their estates or their creditors, or – most importantly, from my perspective – the residents and patients of the Home. In lieu of giving the Trustee relief from the automatic stay, the Debtors wish to provide adequate protection of the liens and security interests of the Trustee in Cash Collateral, as set forth in the proposed form of Interim Order attached to the Cash Collateral Motion.

**D.    Ombudsman Motion**

74.    The Debtors seek entry of an order that no patient care ombudsman shall be appointed in this case because, among other reasons, (i) the Home has historically provided and is currently providing a high quality of care and such standards will continue during the continuance of the Chapter 11 cases; (ii) the Home will, subject to the granting of the Cash Collateral Motion, have cash sufficient to ensure that patient care is not affected by the bankruptcy filing; and (iii) the Home, as a continuing care retirement community, is already subject to review and oversight by a number of regulatory authorities, including the Office of the Attorney General for the Commonwealth of Pennsylvania, the Pennsylvania Department of Health, Division of Nursing; Department of Health, Division of Life Safety; Department of Public Welfare (Office of Long Term Living); and Department of Insurance.    The Home has kept the regulatory authorities abreast of its restructuring efforts prior to the Petition Date, and will continue to keep them fully apprised of material developments during the bankruptcy case. . None of these agencies has expressed concern about the Home's provision of patient care.

75.    The need for bankruptcy is driven by considerations unrelated to patient care. Centers for Medicare and Medicaid Services (CMS) has a 5-star rating system that evaluates quality of care through state inspections, complaint surveys, quality measures and staffing based on acuity.    At this time, the Home has been rated by CMS to have a 4-star rating out of 5 stars, indicating an above standard in quality of care.    The Home has consistently averaged a 4-star rating over the past 2.5 years.    Further, my commitment, as well as that of the entire staff, to the

well-being of residents and patients remains as strong as ever.   The welfare of residents is and will always remain the first priority.  In this case, I do not believe that there will be any tension between the residents and patients and the Home.  The Trustee for the Bondholders has not suggested that the Home should in any way reduce the level of care provided to patients.

76.     The Home is subject to a variety of licensing regimes in the Commonwealth of Pennsylvania.  I believe these regulatory authorities and the Home's historic good standing with these licensing agencies will provide sufficient protection to the patients.

77.     I believe that an ombudsman would serve little purpose in this case.  The Home hopes to conduct a sale or confirm a restructuring plan and to exit bankruptcy as soon as possible.  I believe an ombudsman would only result in additional costs without providing a benefit and that appropriate safeguards are already in place to ensure that patients will receive the appropriate level of care.    The appointment of an ombudsman would be financially burdensome and unnecessary.

**E.     Utilities Motion**

78.     In connection with the operation of their business and  management  of their property, the Debtors obtain electricity, natural gas, water, telephone services, internet, garbage collection, sewerage, and/or other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Providers").

79.     A list of the names and addresses of the Utility Providers, and the average amounts owed per month over the most recent calendar year period by the Debtors is attached to the Utilities Motion as Exhibit "A" (the "Utility Service List").    The Debtors have a history of full payment with each of the Utility Providers and historically have paid utility bills in full when due.

80.     During the course of these cases, the Debtors intend to pay all post-petition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of its business with the Utility Providers and as permitted under the cash collateral budget agreed to with the Trustee for the Bondholders.

81.     Continued utility service is essential to the Debtors' efforts to continue business operations and to successfully reorganize pursuant to Chapter 11 of the Bankruptcy Code. Uninterrupted utility service is especially critical to the Home because it is responsible for the care and well-being of elderly residents.   If this Court were to permit the Utility Providers to suspend or discontinue utility service to the Debtors, the Debtors would not be able to operate, and their efforts to reorganize would be severely hampered.  Specifically, the impact on the Debtors' business operations, relationships with residents, cash flow and revenue would be extremely harmful and would jeopardize the Debtors' efforts to effectively reorganize or maximize the value of their assets for the benefit of all creditors. Such a result would be extraordinarily detrimental to the Debtors' estates and creditors.   It is therefore critical that utility services continue on an uninterrupted basis.

82.     The Debtors have remained current with respect to payments to utilities in the period leading up to the entry of orders for relief. Moreover, the Debtors intend to pay, on a current basis, all of the Utility Providers' post-petition charges during the pendency of these Chapter 11 cases.  Upon the entry of orders for relief, and an order authorizing the use of cash collateral, the Debtors will be in a position to promptly pay all current Utility charges. Accordingly, no Utility Provider will be prejudiced if it continues to furnish and render to the Debtors the services it has rendered in the past.

83.     In order to comply with the adequate assurance requirements of the Bankruptcy Code, the Debtors are proposing to deposit an initial sum equal to twenty five (25%) of the Debtors' estimated average monthly cost of Utility Services calculated based on the historical average over the twelve (12) month period ending before the Petition Date (the "Adequate Assurance Deposit") into an interest-bearing, newly created, segregated account (the "Adequate Assurance Account"), for the benefit of all Utility Providers, with such Adequate Assurance Account to be held pending further order of the Court.  Because the Debtors' average total monthly spending on Utility Services is $62,700, the total Adequate Assurance Deposit will be $15,675.

84.    The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance equal to twenty-five percent (25%) of the Debtors' estimated average monthly cost of Utility Services through the final hearing on this Motion.  Thereafter, the Debtors propose to adjust, without further Court approval or order, the amount on deposit in the Adequate Assurance Account to reflect (i) the termination of Utility Services by the Debtors regardless of any Additional Assurance Requests (as defined in the Utilities Motion) and without giving effect to any rights of setoff or any claims the Utility Providers may assert against the Debtors; and (ii) agreements between the Debtors and the Utility Providers.  These adjustments will permit the Debtors to maintain the Adequate Assurance Account with an amount that consistently provides the Utility Providers with a deposit on account equal to one-fourth of their projected monthly post-petition Utility Services to the Debtors.

85.    I believe that the Adequate Assurance Deposit constitutes sufficient adequate assurance to the Utility Providers, and no further or other assurance is necessary.  If any Utility Provider believes additional assurance is required, however, it may request such assurance pursuant to procedures described in the Utilities Motion.

LEGAL\18714727\6

## CONCLUSION

86.    To minimize any loss of value to their business, the Debtors' immediate objective is to conduct business as usual following the commencement of these Chapter 11 cases, with as little interruption to the Debtors' operations as possible.  If this Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives -- to the maximum benefit of creditors, parties in interest, the Debtors' estates and, most of all, the residents and patients of the Home whose welfare is and will continue to be the paramount concern of the Debtors and their Employees -- will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 25, 2014                    By: _____
                                         Name:   Lisa Sofia
                                         Title:    President and Chief Executive
                                         Officer of the Debtors

23