**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | : Chapter 11 |
| | : |
| THE BAPTIST HOME OF PHILADELPHIA d/b/a | : Bky. No. 14-13305 ELF |
| Deer Meadows Retirement Community, <u>et al.</u>,[1] | : |
| | : |
| Debtors. | : JOINTLY ADMINISTERED |
| | : |

# M E M O R A N D U M

## I.  INTRODUCTION

The Baptist Home of Philadelphia ("the Debtor"), a nonprofit corporation, filed this

chapter 11 bankruptcy case on April 25, 2014.  At the time, the Debtor operated a senior care

facility with 206 licensed skilled nursing beds and 126 independent living and personal care

units in the northeast section of the City of Philadelphia.

In its bankruptcy schedules, the Debtor disclosed two (2) secured debts  –  approximately

$24 million owed to U.S. Bank, N.A., Indenture Trustee ("the Bond Trustee")[2] and

approximately $6.4 million owed to Beneficial Mutual Savings Bank ("Beneficial").  Based on

the filed claims, the Debtor also has approximately $6.3 million in general unsecured debt and

$260,000 in priority debt.[3]  On May 6, 2014, the U.S. Trustee appointed an official committee of

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's
federal tax identification number are: The Baptist Home of Philadelphia d/b/a Deer Meadows Retirement
Community (4330) and The Baptist Home Foundation (7309).

[2]    This debt arose from certain revenue bond transactions that occurred in 1998.

[3]    None of the dollar amounts stated in the text are exact or intended to be binding.  They
(continued...)

unsecured creditors ("the Committee").  The Committee has actively participated in the case.

Presently before the court is the Joint Motion of the Debtor and the Bond Trustee for

Relief from the Automatic Stay ("the Motion")  (Doc. # 399).   In the Motion, the Debtor and the

Bond Trustee seek authorization for a pre-confirmation distribution on account of the Bond

Trustee's claim.  All interested parties, including the Committee, agree that a pre-confirmation

distribution to the Bond Trustee is in the best interests of the estate and creditors and that a

complete payoff of the Bond Trustee's claim is desirable. Interest on the Bond Trustee's claim is

running at the rate of more than $3,000 per day.  Confirmation of the Debtor's proposed chapter

11 plan is not likely to occur until at least February 2015.  A pre-confirmation payoff of the

Bond Trustee's claim prior to confirmation would eliminate the interest running on the bond debt

as well as terminate ongoing legal expenses that are part of the Bond Trustee's secured claim.

These potential savings are substantial and would inure to the benefit of the unsecured creditors.

Before a complete distribution to the Bond Trustee may be made, a dispute must be

resolved regarding the appropriate amount of the distribution necessary to pay off the Bond

Trustee's claim.  The dispute arises from divergent interpretations of a settlement agreement

("the Settlement Agreement" or "the Agreement") approved by this court in June 2014.  The

parties refer to the dispute as "the Carve-Out Dispute" (the nature of which is discussed below)

and the parties report that the amount at issue is approximately $460,000.00.  Resolution of the

Carve-Out Dispute is important to all parties because once the extent of the Bond Trustee's

distribution entitlement is known, the court can authorize distribution of the balance of the Bond

---

[3](...continued)
are sufficiently accurate for the limited purposes of this Memorandum.

Trustee's claim, thereby terminating the accrual of interest and expenses.

By order dated December 18, 2014, I granted the Motion in part and entered an interim

order authorizing the Debtor to pay the Bond Trustee's claim less the roughly $460,000.00 at

issue in the Carve-Out Dispute ("the Holdback").  (Doc. # 188).  The specific issue before the

court is whether the Bond Trustee or the Committee has the superior claim to the Holdback in

the event that the ultimate distribution in the case is insufficient to pay in full both the Bond

Trustee's claim and the allowed unsecured claims.

For the reasons explained below, I conclude that the Bond Trustee has the superior claim

to the Holdback based on the plain meaning of the Settlement Agreement.  Therefore, I will enter

an order authorizing the Debtor to distribute the Holdback to the Bond Trustee.


## II.  THE "CARVE-OUT" DISPUTE

### A.

In the early stages of the case, a number of disputes arose among the parties in interest

concerning, inter alia, the: (1) terms for use of cash collateral; (2) validity and relative priority of

Beneficial's asserted security interest in certain assets; and  (3) procedures for a proposed sale of

substantially all of the Debtor's assets, including the terms for retention of a financial advisor

and investment banker.  The parties reached a global settlement of these disputes.  After notice

and hearing the Settlement Agreement was approved by the court on June 27, 2014.  (Doc. #

188).

The Settlement included provisions that resolved the dispute over Beneficial's lien status

and provided for certain "carve-outs" from secured property for the benefit of unsecured

creditors.

Several components of the Settlement Agreement bear upon the present dispute.

Sections 6 and 7 of the Settlement Agreement resolved the dispute concerning

Beneficial's lien position by:

(1) validating Beneficial's lien against some, but not all, of its claimed collateral;

(2) allowing Beneficial to liquidate and set off its claim against that agreed upon collateral;[4]

(2) requiring Beneficial to "carve-out" $625,000.00 from the proceeds of its collateral for the benefit of unsecured creditors ("the Beneficial Carve-Out");[5] and

(3) allowing Beneficial an unsecured claim to the extent that its entire claim was not satisfied by the liquidation of the collateral.[6]

---

[4]     Section 6.2 of the Settlement Agreement provided:

> The Rule 9019 Order shall include a grant of relief from the automatic stay to Beneficial Bank upon the occurrence of the Effective Date for the limited purpose of permitting Beneficial Bank to set off and apply (i) the Securities Proceeds and (ii) any of the Debtors' cash that is frozen in Beneficial Account No. 6188001371 (together with the Securities Proceeds, the "Beneficial Retained Collateral") against the amounts due and owing from the Debtors to Beneficial Bank under the Line of Credit Note, dated January 22, 2008, and the Line of Credit Note, dated May 9, 2008 (together, the "Beneficial Bank Notes"). Such relief from the automatic stay shall be conditioned upon and subject to Beneficial Bank's compliance with the provisions of section 7.1 of this Agreement.

[5]     Section 7.1 of the Settlement Agreement provided:

> After the Effective Date and concurrent with the setoff and application of the Beneficial Retained Collateral in accordance with section 6.2 of this Agreement, Beneficial Bank shall carve-out from the Beneficial Retained Collateral and any unrestricted funds from Account 6339 and deposit $625,000.00 (the "Beneficial Carve-Out") in an escrow account with U.S. Bank National Association for the benefit of holders of allowed general unsecured claim . . . .

[6]     Section 6.4 of the Settlement Agreement provided that Beneficial would have an allowed unsecured claim, once the deficiency between its entire claim and the net amount realized from the liquidation and set off of the agreed deposit and securities accounts could be calculated. (The net amount
(continued...)

Section 7 of the Settlement Agreement also provided for a carve-out from the proceeds of

the Bond Trustee's collateral for the benefit of unsecured creditors.  The parties included

Beneficial within the class of unsecured creditor to the extent it was undersecured, but subject to

certain limitations on Beneficial's.  This carve-out from the Bond Trustee's collateral[7] consisted

of two (2) separate funds (collectively, "the Bond Trustee Carve-Out"):[8]

> (1) a flat $125,000.00 ("the Sale Proceeds Carve-Out") shared by all unsecured
> creditors other than Beneficial;[9]

> (2) a percentage of the gross sales proceeds from the collateral, ranging from 5%
> and increasing up to 7% as the gross sales proceeds increased ("the
> Percentage Sharing Carve-Out"), with Beneficial splitting the Percentage
> Sharing Carve-Out with the other unsecured creditors on a 35% - 65% basis.[10]

---

[6](...continued)
realized is reduced by the $625,000.00 carve out).

[7]       Section 7.4 of the Settlement Agreement also provided for a carve-out from the Bond
Trustee's cash collateral prior to a sale for the benefit of the fees and expenses of the Committee's
professionals.

[8]       To be clear, the Bond Trustee-Carve-Out and the Holdback are different terms for the
same thing.

[9]       Section 8 of the Settlement Agreement also excluded Beneficial from sharing in any
distribution derived from recoveries in any actions prosecuted under chapter 5 of the Bankruptcy Code.

[10]       Section 7.2 of the Settlement Agreement provided:

> (a) Upon a sale or another disposition approved by the Trustee of all or part of
> the Trustee's Collateral, the Trustee shall carve-out from the proceeds thereof
> for the sole and exclusive benefit of holders of allowed general unsecured
> claims, except as noted in subsection (b) below, an amount equal to:

> > (i)   $125,000.00 (the "Sale Proceeds Carve-Out"), plus

(continued...)

Third, the Settlement Agreement imposed two (2) conditions subsequent with respect to

the Bond Trustee Carve-Out.   The Bond Trustee Carve-Out would be voided if the Committee

or any Committee members (other than Beneficial) supported or did not oppose a plan of

reorganization that did not provide for full payment of the Bond Trustee's allowed claim in

full.[11]  Also, the unsecured creditors could not receive any interest on their claims until the

---

[10](...continued)

> (ii) 5% of any such sale proceeds (on a gross basis) between
> $19,000,000.00 and $21,000,000.00, 6% of any such sale proceeds
> (on a gross basis) between $21,000,000.01 and $22,000,000.00, and
> 7% of any such sale proceeds (on a gross basis) in excess of
> $22,000,000.00 up to the amount needed to satisfy the Trustee's
> allowed claim (the "Percentage Sharing Carve-Out" and, collectively
> with the Beneficial Carve-Out and the Sale Proceeds Carve-Out, the
> "Unsecured Creditors' Carve-Out").

> (b) The Percentage Sharing Carve-Out shall be split among Beneficial Bank and
> all other holders of allowed general unsecured claims (excluding, however, any
> allowed unsecured deficiency claim of the Trustee) as follows: (i) 35% of the
> Percentage Sharing Carve-Out shall be distributed to Beneficial Bank; and (ii)
> 65% of the Percentage Sharing Carve-Out shall be distributed to all other holders
> of allowed general unsecured claims.

[11]      Section 12(a) of the Settlement Agreement provided, in pertinent part:

> The Committee agrees that if (1) it supports or does not affirmatively oppose any
> proposed plan of reorganization or plan of liquidation which does not pay the
> Trustee's allowed claim in full in cash, or provide some other treatment agreed to
> by the Trustee, or (2) any of its members, excluding Beneficial Bank, supports or
> votes in favor of any proposed plan of reorganization or plan of liquidation
> which does not pay the Trustee's allowed claim in full in cash, or provide some
> other treatment agreed to by the Trustee . . .  then in either case on the effective
> date of such plan (unless the Trustee consents otherwise): (i) the Unsecured
> Creditors' Carve-Out shall immediately and irrevocably no longer be held or
> available for the benefit of holders of allowed unsecured claims; (ii) the
> Unsecured Creditors' Carve-Out shall be deemed to be collateral of the Trustee
> in which the Trustee has a perfected first-priority security interest and all funds
> on account of the Unsecured Creditors' Carve-Out held (or to be held) in escrow
> shall automatically and irrevocably be deemed held in trust for the benefit of the
> Trustee  . . .  and (iv) none of the Debtors' estates, the Committee (or its
> members), Beneficial Bank, or any other party in interest shall have any rights,
> interests, or claims in and to the Unsecured Creditors' Carve-Out, or any funds

(continued...)

claims of the Bond Trustee and Beneficial were paid in full.[12]

**B.**

After the Settlement Agreement was approved, the Debtor conducted, and the court later

approved, a sale of virtually all of the Debtor's assets to a third party.  The sale has closed and

resulted in net proceeds in excess of $31 million.  The parties are cautiously optimistic that the

sale proceeds will be enough to pay all claims in full, but there is some uncertainty.  The dispute

arises from that uncertainty and involves the allocation of the risk of nonpayment.          The

question is whether the Bond Trustee or the unsecured creditors should bear the risk of

nonpayment if the distribution is insufficient to pay all creditors in full.  For example, if the

shortfall is $460,000.00 (the amount of the Holdback), which constituency should be paid in full

and which constituency should receive a distribution with a $460,000.00 shortfall?

The Debtor and the Bond Trustee assert that the Bond Trustee Carve-Out, entered into

before the parties knew how successful the asset sale would be, constituted only "down-side"

protection to the unsecured creditors in the event that the sale price was less than the Bond

Trustee's allowed secured claim; in effect, the Bond Trustee Carve-Out provided a guaranteed

---

[11](...continued)
               deposited in escrow on account of the same or the proceeds thereof.


[12]        Section 10 of the Settlement Agreement provided, in pertinent part:
               [T]he Committee, on behalf itself and holders of allowed unsecured claims,
               agrees that, as a condition to the application of the Unsecured Creditors'
               Carve-Out for the benefit of holders of allowed unsecured claims (other than any
               such claims held by Beneficial Bank and the Trustee), such holders shall not
               collect any interest or fees on account of their allowed unsecured claims unless
               and until the allowed claims of Beneficial Bank and the Trustee are paid in cash
               in full.

minimum distribution derived from proceeds of the Bond Trustee's collateral that, in the absence

of the Settlement Agreement, would have been distributed to the Bond Trustee, not the

unsecured creditors.  According to the Debtor and the Bond Trustee, once the sale proceeds

exceeded the minimum distribution guaranteed by the Settlement Agreement (i.e., the Bond

Trustee Carve-Out of $460,000.00), the balance of the sale proceeds should be distributed

according to ordinary principles of priority (meaning, paid first to satisfy the Bond Trustee's

lien).  In their view, if there are insufficient funds to pay unsecured creditors in full, after

satisfaction of the Bond Trustee's allowed secured claim, the unsecured creditors must bear the

loss.

The Committee and Beneficial contend that the Bond Trustee Carve-Out was a transfer of

its right to full payment of its claim  – in effect, either a conditional reduction of its allowed

secured claim in the amount of the carve-out, or a subordination of a portion of the Bond

Trustee's claim to a position junior to the unsecured claims.[13]

Interestingly, the parties on both sides of the question contend that there is no ambiguity

in the Settlement Agreement and that their respective positions are supported by the plain

language and meaning of the Settlement Agreement.

---

[13]      According to Beneficial: "[T]he Settlement Agreement expressly contemplates that the general unsecured creditors might be paid in full before the Trustee has fully recovered on its claims and requires catch-up payments to the Trustee before general unsecured creditors may receive interest on their claims."  (Beneficial's Brief at 2).

### III.  APPLICABLE LEGAL PRINCIPLES

The legal principles to be applied in this matter are well settled.

A settlement agreement is treated as a contract and its meaning is determined by

employed general rules of contract interpretation.  See, e.g., Blunt v. Lower Merion School Dist.,

767 F.3d 247, 282 n.50 (3d Cir. 2014).  In re Cendant Corp. Litig., 233 F.3d 188, 193 (3d Cir.

2000).  "The fundamental rule in interpreting the meaning of a contract is to ascertain and give

effect to the intent of the contracting parties."  Great American Ins. Co. v. Norwin School Dist.,

544 F.3d 229, 243 (3d Cir. 2008) (quoting Murphy v. Duquesne University, 777 A.2d 418 (Pa.

2001 and applying Pennsylvania law).[14]

When the terms of a contract are clear and unambiguous, their meaning is determined

from the four corners of the contract.  See, e.g., Bohler-Uddeholm America, Inc. v. Ellwood

Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001).[15]  However, if the written contract is ambiguous, the

---

[14]       The Settlement Agreement provides that the court should apply Pennsylvania in
construing its meaning. (See Settlement Agreement §14.4).  No party has contended otherwise.


[15]       The parol evidence rule prohibits the admission of extrinsic evidence of prior or
contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when
the parties have reduced their agreement to an unambiguous integrated writing.  E.g., Prior v. Innovative
Communs. Corp, 207 Fed.Appx. 158 (3d Cir.2006) (non-precedential) (citing Richard A. Lord, Williston
on Contracts, § 33 (4th ed. 1999)).  In order to determine whether the parol evidence bars the admission
of evidence, the court must first determine whether the contract is fully integrated. Claret Capital
Nominees v. John Benett, 2010 WL 300288, at *3 (E.D. Pa. 2010); Restatement (Second) of Contracts §
209(2) (whether a contract is fully integrated is "a question preliminary to determination of a question of
interpretation or to application of the parol evidence rule").  A written contract is integrated if it
represents a final and complete expression of the parties agreement. Kehr Packages v. Fidelity Bank,
N.A., 710 A.2d 1169, 1173 (Pa. Super. Ct.1998) (citing Lenzi v. Hahnemann University, 664 A.2d 1375,
1379 (Pa. Super. Ct. 1995)).  In determining whether the contract is fully or only partially integrated,
courts consider whether the contact contains a merger or integration clause, the length and detail of the
contract, the formality of the setting, and whether the contract is a form. See 6 Corbin on Contracts § 25.7
(LexisNexis 2011).

The Settlement Agreement includes an integration clause.  (Settlement Agreement §14.5
(continued...)

parties may offer, and the court may consider, extrinsic evidence to assist the court in resolving

the ambiguity and determining the intent of the parties.  E.g., In re Diet Drugs

(Phentermine/Fenfluramine/Dexfenfluramine) Product Liability Litigation, 706 F.3d 217, 223-24

(3d Cir. 2013); Bohler-Uddeholm America, 247 F.3d at 93.

The determination whether a contract is ambiguous is a question of law determined by

the court. E.g., McDowell v. Phila. Hous. Auth., 423 F.3d 233, 238 (3d Cir. 2005). The court

makes this determination by considering, from an objective standpoint, whether the language in

the contract is reasonably susceptible to at least two (2) different interpretations. E.g., USX

Corp. v. Penn Cent. Corp., 130 F.3d 562, 566 (3d Cir.1997); In re Garmin, 413 B.R. 215, 223

(Bankr. E.D. Pa. 2009).  In making the determination whether an ambiguity exists, "a court must

consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic

evidence offered in support of those meanings."[16]  Kroblin Refrig. Xpress, Inc. v. Pitterich, 805

_____

[15](...continued)
("This Agreement constitutes the complete agreement among the Parties with respect to the
subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with
respect thereto").  All the parties agree that it is an integrated agreement.


[16]        The Third Circuit Court of Appeals has pointed out that there are limits to the scope of
the court's consideration of extrinsic evidence in determining whether an ambiguity exists:

> It is important for present purposes to note that extrinsic evidence of the
> negotiations, conduct and other circumstances of the parties is important to a
> court's analysis of whether an agreement is ambiguous only to the extent, if any,
> that such evidence provides objective indicia that, from the linguistic reference
> point of the parties, the terms of the contract are susceptible of different
> meanings. That is, extrinsic evidence is permitted because the law recognizes that
> the meaning of words can depend on context, and what may seem unambiguous
> without context (or in the context that the judge may hypothesize, based on his or
> her own experience) may be ambiguous when understood from the linguistic
> reference point of the parties. But the focus must remain on the language chosen
> by the parties, and a text unambiguous when accorded the commonly understood
> meaning of its words cannot be disregarded unless the extrinsic evidence is such

(continued...)

F.2d 96, 101 (3d Cir.1986); accord Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d

107, 111 (3d Cir.1994); Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d

Cir. 1980).  In evaluating the language of the contract, a court should give the words their plain

and ordinary meaning.  Blunt, 767 F.3d at 282 n.50.  A contract is not rendered ambiguous

merely because the parties do not agree on its meaning.  See, e.g., Diet Drugs, 706 F.3d at 224;

Garmin, 413 B.R. at 223.


## IV.  DISCUSSION

### A.

I agree with the Debtor and the Bond Trustee that the Settlement Agreement

unambiguously expressed the parties' intent to provide a minimum recovery to unsecured

creditors from the sale proceeds derived from the Bond Trustee's collateral and was not intended

to reduce the Bond Trustee's allowed secured claim or subordinate any portion of that claim in

favor of the unsecured creditors.

### 1.

The most compelling indication of the parties' intent is their unqualified use of the words

"**carve-out from the proceeds**" of the Bond Trustee's collateral.  (Settlement Agreement

§7.2(a)).

---

[16](...continued)
            as might cause a reasonable fact finder to understand the text differently.

American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181–82 (3d Cir.1995) (quotation
marks and citations omitted).

            In this case, no party has offered any extrinsic evidence in an effort to establish that an
ambiguity exists.  To the contrary, all of parties argue that the contract is unambiguous making all resort
to extrinsic evidence unnecessary.

The words "carve-out" and "proceeds," used together, strongly suggest that the parties

agreed that the Bond Trustee would allocate a fixed sum from the proceeds of its collateral

(calculated under §7.2(a)) to be distributed for the benefit of unsecured creditors.  Through the

relatively sparse language of the Settlement Agreement, the parties agreed to alter the

Bankruptcy Code distribution scheme by giving the unsecured creditors a limited priority in the

distribution of the proceeds of the collateral.  I see nothing more than that in the words of the

Settlement Agreement.

The Settlement Agreement verbiage is economical because the term carve-out has an

understood meaning in the bankruptcy community.

> The term "carve out" is one of those uniquely bankruptcy phrases, much like
> "cram down," that appears nowhere in the bankruptcy statute but connotes
> definite meaning to parties. It is an agreement by a party secured by all or some of
> the assets of the estate to allow some portion of its lien proceeds to be paid to
> others, i.e., to carve out of its lien position. **It commonly arises in two contexts.
> The first, applicable here, is where there are no unliened assets and the lien
> creditor agrees to release funds to unsecured creditors as an incentive to the
> Chapter 7 trustee to administer the assets**. Carve outs are also common in
> Chapter 11 cases in favor of debtor's attorneys as part of cash collateral
> agreements

In re White Glove, Inc., 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998).

The instant case is analogous to the first of the two situations described in the passage

quoted above, albeit in the chapter 11 sale context, rather than in the chapter 7 sale context (a

distinction that is immaterial for present purposes).  As White Glove indicates, the use of the

word carve-out usually connotes to bankruptcy professionals that although there may be no

unencumbered assets for distribution to unsecured creditors, it may be in the interest of the

secured and unsecured creditors alike to liquidate the collateral in the bankruptcy case. For

unsecured creditors, the carve-out agreement may represent their only chance of obtaining any

distribution on their claims.  For the secured creditor, the carve-out agreement manifests its

business judgment that it is in its interest to pay over some portion of the proceeds of its

collateral to unsecured creditors as a condition of liquidating the collateral promptly through the

bankruptcy process.  Typically, under a carve-out agreement, the secured creditor takes on no

obligation other than the payment of the agreed amount of the carve-out.  Other than accounting

to the bankruptcy estate for the agreed upon carve-out, the secured creditor's rights in the

balance of the proceeds of its collateral are unimpaired.

In this case, had the parties intended anything other than the limited alteration in ordinary

bankruptcy distribution principles described above, the sophisticated parties and counsel that

negotiated the agreement necessarily would have drafted additional provisions to make that

intent clear.  Such provisions likely would have employed words other than the single phrase,

"carve-out from proceeds."  Undoubtedly, the additional provisions would have made reference

to a "reduction" or "subordination" or "limitation" of the Bond Trustee's claim; or to a "gift" of

the Trustee's "recovery" or "distribution rights" to the general unsecured creditor class; or the

like.  But the Settlement Agreement contains no such language.[17]

Instead, § 7.2(a)(ii) manifests the parties' intention that the Bond Trustee claim is to be

paid in full, subject to the carve-out.

Section 7.2(a) provides for a carve-out of a specific percentage of the sale proceeds based

upon a formula.  The less realized from the sale, the lower the percentage would be in computing

---

[17]    The Debtor summed it up well in its brief:

> Given the sophistication of the parties involved in negotiating and drafting the
> . . . Settlement Agreement, it cannot be argued credibly that a concession so
> profound on the part of the [Bond] Trustee – an agreement that, even if
> comfortably oversecured, the [Bond] Trustee would not receive payment in full
> of its allowed claim unless and until each and every other creditor in the case was
> paid in full – would be baked implicitly into the term "carve-out".

(Debtor's Brief at 4).

the carve-out.  For instance, if the sale realized between $19 million  and $21 million, the Bond

Trustee would carve out only 5% of those proceeds for the allowed general unsecured claim

holders.  Similarly, if the sale realized between $21 million and $22 million, the carve-out would

be supplemented by 6% of those additional proceeds.  Most telling is the next step in the

formula.  If the sale proceeds exceeded $22,000,000, the carve out would be supplemented

further by 7% of the additional proceeds, but only up to "the amount needed to satisfy the

Trustee's allowed claim."  **Thus, the carve-out ceases once the proceeds equal the amount of**

**the Bond Trustee's claim**.  This is a clear indicator that the carve-out provided unsecured

creditors with no claim to any proceeds of collateral in excess of the "the amount needed to

satisfy the Trustee's allowed claim."  Yet, that is exactly what the Committee seeks in arguing

that proceeds received in excess of the amount of the Bond Trustee's allowed claim should be

paid to the unsecured creditors ahead of the Bond Trustee in the event that both constituencies

cannot be paid in full.[18]

**2.**

As the Debtor and the Bond Trustee point out, their straightforward reading of the

meaning of §7.2(a) of the Settlement Agreement is reinforced by §12(a) of the Agreement.

Section 12(a) voided the Bond Trustee Carve-Out, if the Committee or any Committee

---

[18]      The "ceiling" in the carve-out calculation also demonstrates that the carve-out was
designed to provide exactly the type of "down-side" protection suggested by the Bond Trustee and the
Debtor.

Assume, for example, that the sale proceeds happened to equal the exact amount of the
Bond Trustee's allowed secured claim.  Absent the carve-out, all of the proceeds would be distributed to
the Bond Trustee, leaving nothing for the unsecured creditors.  The carve-out formula, as negotiated,
provided for a minimum recovery for unsecured creditors in that event.

members (other than Beneficial) supported or did not oppose a plan of reorganization that did

not provide for full payment of the Bond Trustee's allowed claim in full.  Unless §7.2(a) is

interpreted to mean that the Bond Trustee agreed to reduce its allowed secured claim by the

amount of the Bond Trustee Carve-Out (a concept that is nowhere expressed in the Settlement

Agreement), §12(a) evinces the parties' intention that the Bond Trustee's claim be paid in full.

Section 12(a) is difficult, if not impossible, to reconcile with an interpretation of the Settlement

Agreement in which some portion of the Bond Trustee's claim (measured in the amount of the

Bond Trustee Carve-Out) is either reduced by the amount of the carve-out or subordinated to the

unsecured claims.


**B.**

Notwithstanding the straightforward reading of the carve-out provisions of the Settlement

Agreement set out above, the Committee and Beneficial insist that the Settlement Agreement

provided for unsecured creditors to be paid in full ahead of the Bond Trustee to the extent of the

amount of the Bond Trustee Carve-Out.  Their main argument is one of negative implication.

The Committee and Beneficial compare §6.4 and §7.2 of the Settlement Agreement.

Section 6.4, which provides for the Beneficial Carve-Out to unsecured creditors, includes a

mechanism for calculating Beneficial's allowed unsecured claim.  Section 7.2, which provides

for the Bond Trustee Carve-Out, lacks any similar mechanism for the calculation of a Bond

Trustee deficiency claim.  Based on the use of the same word  –  "carve-out"  –  in both

provisions, the Committee and Beneficial argue that the Settlement Agreement necessarily was

intended to treat the Bond Trustee and Beneficial in the same way following the carve-out.

Specifically, they contend that just as the Beneficial Carve-Out reduced its allowed secured

claim by the amount of the Beneficial Carve-Out, so too the Bond Trustee reduced its allowed

secured claim by the amount of the Bond Trustee Carve-Out (or at least subordinated its right to

receive a distribution on the amount of the carve-out until after unsecured creditors were paid in

full).

As stated earlier, this argument reads far too much into the use of the word "carve-out" in

the two (2) sections of the Settlement Agreement.  It also fails to account for the different

positions of Beneficial and the Bond Trustee at the time the parties entered into the Agreement.

It is obvious from §6.4 of the Settlement Agreement that the parties contemplated as a

virtual certainty that Beneficial's allowed claim would be undersecured after it ceded its claim to

certain collateral and provided for the Beneficial Carve-Out.  This is likely because the parties

knew that the value of the deposit and investment accounts serving as Beneficial's collateral

could not possibly satisfy Beneficial's claim in full (especially after the Beneficial Carve-Out).

The same cannot be said regarding the Bond Trustee's collateral, which was of an entirely

different nature.  The parties did not know what the sale of the Bond Trustee's collateral would

bring.  Certainly, there was the possibility that the Bond Trustee's claim would be undersecured,

but the Settlement Agreement did not assume that would be the case.  (And, as it turns out, once

the actual sale of the collateral took place, the Bond Trustee's claim was not undersecured).  This

difference in status of the two (2) secured creditors, by itself,  reasonably accounts for the

differences in the two sections of the Agreement.

The Committee and Beneficial also make an untenable inference when they suggest that

the absence of a mechanism in §7.2 for determining and allowing as an unsecured claim any

undersecured portion of the Bond Trustee's claim, juxtaposed against the provisions in §6.4 for

determining and allowing Beneficial's allowed unsecured claim, demonstrates that the Bond

Trustee was waiving its right to payment of the amount of the Bond Trustee Carve-Out or was

subordinating its secured claim to that extent of that carve-out.  A far more compelling

explanation for the absence of a mechanism in §7.2 for calculating the Bond Trustee's potential

unsecured claim is that the parties had no need to include such provisions in the Settlement

Agreement.  This is so because, absent an agreement, any unsecured claim that the Bond Trustee

might hold would be determined in accordance with the applicable provision of the Bankruptcy

Code, i.e., 11 U.S.C. §506(a).  Under §506(a), the Bond Trustee's allowed secured claim would

be determined based on the extent of the proceeds available for payment of its claim after

payment to the unsecured creditors of the distribution guaranteed by the Bond Trustee Carve-

Out.  The most natural interpretation of §7.2 is that it deferred the claims allowance process to

the Bankruptcy Code and the Bankruptcy Rules.[19]

---

[19]     In support of its interpretation, Beneficial points to §10 of the Settlement Agreement,
which provides that unsecured creditors (other than Beneficial) may not collect any interest on their
claims "unless and until the allowed claims of Beneficial Bank and the Trustee are paid in cash in full."

     Certainly, §10 seems unnecessary in that under the Bond Trustee's interpretation of the
Agreement, unsecured creditors may not receive full payment of the principal amount of their claims,
much less interest on such claims, until the Bond Trustee's allowed claim has been paid in full from the
proceeds of the collateral (and after payment of the Bond Trustee Carve-Out to the unsecured creditors).
And, I acknowledge that an interpretation that arguably may render a contract provision surplusage is
disfavored . See, e.g., Riverside School Dist. v. Career Technology Center of Lackawanna County, 2014
WL 5652804, at *2 (Pa. Cmwlth. Ct. Nov. 5, 2014).

     I am unpersuaded by this argument.

     Section 10, an arguably superfluous provision, on its face, appears designed to protect the
Bond Trustee's rights and limit the rights of the unsecured creditors, not the other way around. By itself,
§10 is insufficient to establish that the parties intended to reduce the Bond Trustee's allowed secured
claim (or at least subordinate a portion of it).  I consider it far more likely that §10 was placed in the
Settlement Agreement as a form of "belts and suspenders" provision to make it abundantly clear that the
Bond Trustee's lien rights were unimpaired, except to the extent of the Bond Trustee Carve-Out, rather
than as a manifestation of an implied intention to reduce the Bond Trustee's rights.

     Furthermore, the provision may not even be surplusage in that it purports to provide the
Bond Trustee with an express contractual right to recover any distributions on account of interest

(continued...)

**C.**

In the end, the Committee and Beneficial conflate the relatively simple concept of a

"carve-out from proceeds of collateral," as it is commonly understood in bankruptcy practice,

with the concepts of claims allowance or subordination.  Their arguments are clever and

creative,[20] but they strain to, and ultimately find no support in, the plain language of the

Settlement Agreement.

From an objective standpoint, I conclude that there is no ambiguity in the Settlement

Agreement and it is not susceptible to the interpretation urged by the Committee and Beneficial.

The plain language of the Settlement Agreement provided only for a guarantee of a minimum

distribution to the unsecured creditors from the Bond Trustee's collateral in an amount that

increased as the sales proceeds increased, but that also was capped once the sales proceeds

equaled the amount of the Bond Trustee's claim.  So long as the Bond Trustee provides the

agreed funds for distribution to unsecured creditors in the amount required by §7.2 of the

Settlement Agreement, its rights in the collateral (and the proceeds thereof) were not impaired by

---

[19](...continued)
wrongfully made to unsecured creditors.


[20]      The Committee makes two (2) other related arguments that are unpersuasive.

        The Committee suggests that the Bond Trustee is attempting to obtain a distribution from
the Bond Trustee Carve-Out in contravention of §7.3 of the Settlement Agreement ("Except as otherwise
expressly set forth in this Agreement, neither the Trustee nor Beneficial Bank shall be entitled to any
distribution from the Unsecured Creditors' Carve-Out").  Similarly, the Committee asserts that the Bond
Trustee is attempting to expand the scope of its collateral because "it simply cannot be that a secured
creditor can . . . [recover] . . . the full amount of its secured claim and still pay the carve out to the
unsecured creditors from the same collateral pool." (Committee Brief at 6).  However, these are both
bootstrap arguments because they assume that the carve-out was intended to diminish or subordinate the
Bond Trustee's allowed secured claim rather than simply provide the unsecured creditors with a minimum
recovery through a priority interest in the proceeds of the collateral.

the Settlement Agreement and the Committee and Beneficial will receive what they bargained for in the Settlement Agreement.  Put another way, subject to its commitment to fund the agreed carve-out, the Bond Trustee is entitled to realize the balance of the proceeds of its collateral in satisfaction of its allowed secured claim.  To the extent that the balance of those proceeds are insufficient to pay both the Bond Trustee and the unsecured creditors in full, the unsecured creditors must bear the risk of loss.

## V. CONCLUSION

For the reasons set forth above, I conclude that the pre-confirmation distribution on account of the Bond Trustee's claim may be completed in a manner that satisfies its claim in full and that it is unnecessary for the bankruptcy estate to retain the amount of the Bond Trustee Carve-Out as a Holdback to mitigate against the possibility that ultimately, there will be insufficient funds in the bankruptcy estate to pay unsecured creditors in full.  An appropriate order follows.

**Date: <u>December 31, 2014</u>**

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**